IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
July 28, 2020 Session

## STATE OF TENNESSEE v. AUSTIN FORKPA

**Appeal from the Criminal Court for Washington County**
No. 44904     Stacy L. Street, Judge

### No. E2019-01605-CCA-R3-CD

After a bench trial, the Defendant, Austin Forkpa, was convicted of resisting arrest, for which he received a six-month sentence. On appeal, the Defendant argues that his conviction was not supported by sufficient evidence, specifically alleging that he did not intentionally use force to prevent or obstruct an arrest and, alternatively, that he was acting in self-defense based upon the officers' use of excessive force. After our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ROBERT H. MONTGOMERY, JR., JJ., joined.

Patrick G. Frogge, Executive Director, District Public Defenders Conference (on appeal); and Jeffrey C. Kelly, District Public Defender, and William L. Francisco, Assistant District Public Defender (at trial), for the appellant, Austin Forkpa.

Herbert H. Slatery III, Attorney General and Reporter; Courtney N. Orr, Assistant Attorney General; Kenneth C. Baldwin, District Attorney General; and Michael D. Rasnake, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION
FACTUAL BACKGROUND

This appeal stems from an encounter the Defendant had with two police officers at a Johnson City gas station during the early morning hours of January 4, 2019. Following the incident, an assert warrant was issued for the Defendant, and he was charged with resisting arrest in the General Sessions Court for Washington County. See Tenn. Code Ann. § 39-16-602. After being found guilty in general sessions court and receiving a sentence of six months supervised probation, the Defendant appealed to the Washington

County Criminal Court for a de novo trial. See Tenn. Code Ann. § 27-5-108. The Defendant proceeded to a bench trial that was held on August 6, 2019.

At trial, the State presented the following proof. Tennessee Highway Patrol ("THP") Sergeant Alex Perry, who had worked in law enforcement for sixteen years, testified regarding his encounter with the Defendant. Sergeant Perry stated that just after midnight on January 4, 2019, he was contacted by THP Trooper William Andrew Connors for assistance with identifying an individual that Trooper Connors observed at a Sunoco gas station pumping gas in a silver SUV. Trooper Connors thought the individual might be the subject of "felony warrants" from Chattanooga. According to Sergeant Perry, Trooper Connors had received an email from "a drug unit" relaying information about a wanted person; the email included a photograph and description of the suspect.

Upon Sergeant Perry's arrival at the gas station, Trooper Connors showed Sergeant Perry the photograph of the suspect, as well as relaying the description of the individual to Sergeant Perry. Trooper Connors asked Sergeant Perry if he thought the Defendant looked like the wanted person from the email, and Sergeant Perry confirmed that the individual at the gas pump appeared to match the height, weight, hair color, and hair style descriptions of the suspect in the email. Sergeant Perry opined that "[i]t look[ed] almost just like him," though Sergeant Perry later equivocated that he "couldn't say for sure it was or it wasn't" him. In addition, Sergeant Perry indicated that Trooper Connors "had spoken with this drug unit by phone multiple times" and that Trooper Connors informed him that this suspect "had a long history of running and fleeing from law enforcement."

They decided to approach the individual in order to identify him. They pulled their patrol cars in front of and behind the SUV as the Defendant was pumping gas. They exited their cars, approached the Defendant, and began speaking with him. Their interactions were recorded by Sergeant Perry's dashboard camera, which recording was admitted as an exhibit.

The video was played for the court. When the recording began at 12:28 a.m., the officers had already approached the Defendant and were standing on either side of the Defendant as he was pumping gas. According to Sergeant Perry, approximately thirty-five to forty seconds had elapsed prior to the recording's beginning. Sergeant Perry explained that this was the way his camera system was set up, that there was a delay once the camera was activated, and that it also took "a minute for the sound to kick in" once he turned on his microphone. Sound began on the recording approximately one minute after the video began.

The recording reflected that the officers informed the Defendant that they were looking for a possible suspect. They asked for the Defendant's name, but the Defendant said he would give officers his name only if they gave him their badge numbers. The

Defendant eventually told the officers his name several times and spelled his last name. However, the Defendant refused to give the officers his birthdate, claiming that he was being harassed for being Black with dreadlocks, and he said he was going to "make this hard" for the officers. The Defendant appeared to be recording the interaction on his phone, and he asked the officers to record their interaction for his protection. The officers told the Defendant that they needed to determine whether he was the person they were looking for from the email.

When the Defendant stated that he wanted to wait in his car, Sergeant Perry advised the Defendant that he could not do so and that he was being detained until they could confirm his identity. The Defendant refused to provide them with further identifying information. Sergeant Perry called for the Johnson City Police Department to come to the scene to assist with verifying the Defendant's identity. At that point, the Defendant told the officers he was going to put his hair back into a ponytail so that he did not lose any "dreads," fearing that the officers would "slam [him] on [his] head"; the officers indicated to the Defendant that whether the confrontation turned physical was "up to" the Defendant. Trooper Connors also told the Defendant that they could do this "the easy way or the hard way."

After putting his hair up, at approximately 12:32 a.m., the Defendant turned around and put his hands behind his back towards Trooper Connors. Sergeant Perry retrieved his handcuffs and attempted to handcuff the Defendant. Sergeant Perry placed a cuff on the Defendant's right wrist, but the Defendant pulled away. Each officer had one of the Defendant's arms as they were trying to handcuff him, telling him not to resist as the Defendant moved forward and fidgeted. The Defendant then made a lunging-type movement towards the gas pump using the ledge of the gas pump as leverage against the officers, but the Defendant was unable to free himself from their grasp. In the physical confrontation that ensued, Trooper Connors placed his leg behind the Defendant's knee in an attempt to take the Defendant down, and the three men ended up on the ground—Trooper Connors was on the bottom of the pile; the Defendant in the middle; and Sergeant Perry on top. The officers repeatedly yelled at the Defendant to "stop resisting" and instructed him to place his hands behind his back. A woman ran over to the encounter to see what was going on, and she told the Defendant to "stand up" and stop resisting the officers. Eventually, the Defendant stopped struggling; his legs relaxed; and he said, "I'm not doing nothing, I promise." The Defendant apologized profusely. About one minute later, the officers were no longer forcibly entangled with the Defendant, and the Defendant was face-down of his own volition in the parking lot, handcuffed. The Defendant was informed he was under arrest and given his Miranda rights. The woman appeared to begin recording the encounter on her cell phone. After seeking confirmation from the Defendant that he would comply with the officers' commands, the Defendant was brought to his feet at 12:36 a.m. and placed in the back of Sergeant Perry's patrol car.

It is unclear from the record precisely when the video was stopped. The Defendant lodged an objection "to any further playing of the video" apparently after the encounter ended and the Defendant had been placed in the back of Sergeant Perry's patrol car. After some discussion between the parties, the Defendant's objection was sustained in part and overruled in part. The State was permitted to forward to a portion of the recording where the Defendant was discussing his role in this incident with the officers, making "admissions as to why he acted the way he did." However, once again, there were no time references as to when the recording was started and stopped.

Later in the recording, Sergeant Perry was overheard conversing with the Defendant.[1] Sergeant Perry, first observing that the Defendant started trying to fight the officers after he had put his hands behind his back, asked the Defendant how he would describe his actions. The Defendant responded, "Self-defense." Sergeant Perry then indicated that no one attacked the Defendant and remarked that they were simply trying to put handcuffs on the Defendant's wrists.

At trial, Sergeant Perry maintained that during the struggle, he had taken hold of one of the Defendant's arms while Trooper Connors had the other. Sergeant Perry explained that after he placed a cuff on the Defendant's right wrist, the Defendant "tensed up" and brought his free hand, which was being held by Trooper Connors, to the front. Sergeant Perry indicated that Trooper Connors was attempting to force the Defendant's hand behind the Defendant's back without injuring him when Trooper Connors pulled the Defendant to the ground. Sergeant Perry said that he lost his grip on the Defendant's right hand when they went to the ground but was able to regain control of it, holding it as tightly as possible.

Sergeant Perry said that once they were on the ground in this "contorted position," the Defendant continued to try to pull away from them and get to his feet. According to Sergeant Perry, "[t]he whole time" the Defendant was "still pushing and resisting," even pushing on the ledge of the gas pump, "fighting with everything he had." Sergeant Perry maintained that he was merely "trying to hold" the Defendant in that position so that the Defendant could not fight or flee, and Sergeant Perry noted that the Defendant had not been patted down at that point. Sergeant Perry estimated that the struggle lasted between thirty and forty-five seconds before the Defendant "tire[d] out" and complied. Sergeant Perry opined that he "was using the force necessary to take the suspect into custody. No more."

After placing the Defendant under arrest and determining the Defendant's identity, Sergeant Perry was able to confirm that the Defendant did "have warrants out," though the Defendant was not the suspect from the email. Sergeant Perry was asked if, based upon

---

[1] We discern that this is the portion of the recording that was played for the trial court. However, we cannot say for certain given the lack of any time references in the record.

his law enforcement experience, anything about the Defendant's behavior prior to his arrest indicated that the encounter "might turn physical." Sergeant Perry replied that although it was not depicted in the recording, upon Trooper Connors's approach, the Defendant placed his right hand in his pants. Sergeant Perry observed Trooper Connors place his hand on his gun, though he did not remove it from the holster, and order the Defendant to take his hand out of his pants. According to Sergeant Perry, the Defendant responded, "It's a free country. It's America. I'll put my hands in my pants if I want to," and he put both hands in his pants. When Trooper Connors "[w]asn't getting anywhere," Sergeant Perry then engaged in conversation with the Defendant to de-escalate the situation, attempting to explain why they were there, and the Defendant removed his hands from his pants. Sergeant Perry further opined that when the Defendant placed his hair back into a ponytail so as not to lose any dreads, this was a signal from the Defendant that he was going to leave or fight the officers.

On cross-examination, Sergeant Perry confirmed that he and Trooper Connors were both significantly larger than the Defendant. Sergeant Perry also confirmed that there was a woman observable in the recording, though Sergeant Perry believed she was concerned because she was acquainted with the Defendant. When asked specifics about the description of the individual in the email as compared with the Defendant's identifying characteristics, Sergeant Perry stated, "If I had any point that I could say for sure it was not him, I would have immediately broke off my . . . contact with him."

Finally, Sergeant Perry agreed that he had a "disciplinary history" with the Tennessee Highway Patrol during his four and one-half years of employment. This history, which reflected his incidents of firearm discharge, use of force, administrative investigations, departmental pursuits, a vehicle accident, and a citizen complaint, was introduced as an exhibit. As for the firearm discharge and departmental pursuit investigations referenced in the document, Sergeant explained that this was part of "quality control" by the THP, was automatic for any trooper in the state involved "in a use of force or pursuit," and was not an investigation into any "wrongdoing." According to Sergeant Perry, he was possibly involved in more pursuits than other troopers because he worked "straight night shifts." Sergeant Perry's history also indicated that following several administrative investigations, he had received two oral warnings, one written warning, and had been suspended for two days; however, he was not asked at trial about the substance of these.

The State then introduced certified copies of the Defendant's convictions, which reflected that in case number 40480, the Defendant had been convicted of Class D felony theft and had received a two-year probationary sentence, and in case number 41068, the Defendant had been convicted of Class B felony cocaine possession for resale and had received an eight-year probationary sentence. A copy of his probation conditions was also

- 5 -

included with the exhibit. The State argued that the "Defendant acted against the ten[e]ts of the law as . . . any other ordinary citizen." The State then cited to Roberts v. State, 546 S.W.2d 264 (Tenn. Crim. App. 1977), for the proposition that as a probationer, the Defendant was "on notice that he [was] to act as a good citizen," as well as citing to Barker v. State, 483 S.W.2d 586 (Tenn. Crim. App. 1972), for the proposition that because the Defendant was "obligated to cooperate fully" with "his probation counselor" and the court, the Defendant was also obligated to give his name and birthdate to the officers under these circumstances.

After the State rested, the Defendant called Trooper Connors to the stand. Trooper Connors's disciplinary history with the THP was introduced as an exhibit, reflecting his incidents of use of force, an administrative investigation, and departmental pursuits. In all incidents, Trooper Connors was "exonerated," and no punishments, warnings, or suspensions were reflected in Trooper Connors's history.

On cross-examination, Trooper Connors testified that the Defendant did not have any "official State" identification on his person at the time of his arrest. Trooper Connors indicated that after the Defendant's arrest, they found some paperwork in the SUV with the Defendant's name, birthdate, and "a Social or something" on it.

Following the conclusion of proof, the State argued that it had proved its case for resisting arrest beyond a reasonable doubt, noting the Defendant's "intent and attitude" from the beginning of the encounter was clear. In response, defense counsel submitted that the Defendant acted in self-defense when he resisted officers. Defense counsel claimed the Defendant's use of force was "reactionary to the amount of force used upon him," noting that the Defendant was "sandwiched between two large, strong officers," that "there [was] no logic to a resistance," and that there was a "concerned" lady on the scene. Finally, defense counsel observed that "there were concerns about the detention," though he acknowledged that "an unlawful arrest [was] not a defense."

In issuing its ruling, the trial court indicated that it had reviewed all the testimony and exhibits introduced, including the recording from Sergeant Perry's dashboard camera. The court also indicated that it had reviewed the jury instructions for resisting arrest, including the definitions of force and intentionally. Ultimately, the trial court found the Defendant guilty as charged of Class B misdemeanor resisting arrest. Specifically, the court found that the Defendant "prevented or obstructed . . . an arrest or a search or a brief detention by a person known to be a law enforcement officer," that the Defendant "used force against the law enforcement officer," and that the Defendant "acted intentionally."

With regard to force, the court observed,

Trooper Perry puts one handcuff on [the Defendant's] right arm. . . .

- 6 -

. . . .

At that point in time[, the Defendant's] left hand shoots to the front. He begins resisting the attempt to handcuff the second hand. He begins jerking his arm. He begins moving his body, fighting back. And under the definition of "force" which says, "[c]ompulsion by use of physical power or violence," [it] doesn't take a . . . push or anything like that, it took -- simply took [the Defendant] to -- to move or tense up or lean forward, whatever he did to prevent the -- or attempt to prevent the trooper from handcuffing the second hand.

The trial court also concluded that nothing in the video suggested "that there was excessive force used" at the time Sergeant Perry put the cuff on the Defendant's right hand. Finally, the trial court remarked, "The things that happened after that point, [the Defendant's] dramatic actions in the back of the vehicle, the two troopers -- one on top and one on the bottom -- almost underneath a car, while both are distasteful to this [c]ourt, have nothing to do with the charge."

The Defendant received a sentence of six months in the county jail, with credit for time served.[2] The Defendant did not file a motion for new trial, but he instead filed a timely notice of appeal in this court challenging the sufficiency of the evidence. The case is now before us for our review.

## ANALYSIS

On appeal, the Defendant contends that the evidence was insufficient to sustain his conviction. First, he argues that he did not resist his unlawful arrest because "he did not intentionally try to prevent the arrest and because he did not use force to prevent the arrest." Second, he alleges that even if his reaction to the unlawful arrest meets the definition of resisting arrest, "he was justified in using force against the two larger police officers who terrified him as they unlawfully arrested him." The State maintains that the evidence is sufficient to support the Defendant's conviction for resisting arrest beyond a reasonable doubt, noting that the video showed that the Defendant "forcibly pulled away from officers and fought them as they tried to place the handcuffs on his wrists." In response to the Defendant's second argument, the State responds that the evidence did not support the Defendant's self-defense claim, contending that the Defendant's "use of force was not

---

[2] Immediately after the bench trial and sentencing for resisting arrest, the Defendant pled no contest to violating his probation in his two prior cases.

justified because he was not reacting to officers' use of excessive force." We are inclined to agree with the State.

When examining the sufficiency of the evidence, we must consider "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). Accordingly, in a bench trial, the trial judge, as the trier of fact, must resolve all questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence. State v. Ball, 973 S.W.2d 288, 292 (Tenn. Crim. App. 1998). The trial judge's verdict carries the same weight as a jury verdict. State v. Hatchett, 560 S.W.2d 627, 630 (Tenn. 1978).

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Bland, 958 S.W.2d at 659; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). A guilty verdict "may not be based solely upon conjecture, guess, speculation, or a mere possibility." State v. Cooper, 736 S.W.2d 125, 129 (Tenn. Crim. App. 1987). However, "[t]here is no requirement that the State's proof be uncontroverted or perfect." State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). Put another way, the State is not burdened with "an affirmative duty to rule out every hypothesis except that of guilt beyond a reasonable doubt." Jackson, 443 U.S. at 326.

The foregoing standard "applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of [both] direct and circumstantial evidence." State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Both "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." State v. Dorantes, 331 S.W.3d 370, 381 (Tenn. 2011). The duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).

The Defendant was convicted of resisting arrest. Tennessee Code Annotated section 39-16-602(a) provides that it is a criminal offense for "a person to intentionally prevent or obstruct anyone known to the person to be a law enforcement officer . . . from effecting a stop, frisk, halt, arrest or search of any person, including the defendant, by using force against the law enforcement officer or another." Tenn. Code Ann. § 39-16-602(a). Force

is defined as "compulsion by the use of physical power or violence and shall be broadly construed to accomplish the purposes of this title." Tenn. Code Ann. § 39-11-106(a)(12). "'Passive resistance' generally does not constitute using force as contemplated by the preventing or obstructing an arrest statute." State v. Burgess, 532 S.W.3d 372, 393 (Tenn. Crim. App. 2017) (citing State v. Corder, 854 S.W.2d 653, 655 (Tenn. Crim. App. 1992) (concluding that the defendant's not moving and directing obscene language at officers were insufficient to support a conviction for resisting arrest)). Moreover, except in the case of self-defense, the statute specifically provides that an unlawful arrest is not a defense to resisting arrest. Tenn. Code Ann. § 39-16-602(b).

The Defendant first argues that he did not intentionally use force to prevent his unlawful arrest. According to the Defendant, he "merely moved his arm from the back to the front" after giving the officers his name and offering his hands to be cuffed, which does not amount to resisting arrest because "nothing else in the entire encounter indicates" consciousness of guilt. However, in the light most favorable to the State, the evidence shows that the Defendant intentionally used force against the officers who were attempting to effectuate his detention or arrest. We disagree with the Defendant's assertion that he "allowed handcuffs to be placed on his hands," that he "generally followed orders," that he "intended to allow [the officers] to arrest him despite the fact" that the officers had misidentified him, and that the amount of force used by the Defendant was "negligible."

Here, though the Defendant originally placed his hands behind his back to be cuffed, and Sergeant Perry was able to place cuffs of the Defendant's right wrist, the Defendant moved his left arm forward, "tensed up," and began to pull away from the officers as Sergeant Perry attempted to place the cuff on the Defendant's other wrist. When the Defendant began to fidget and attempted to pull away from the officers' grasp, the officers told the Defendant not to resist, but the Defendant persisted. The Defendant then made a lunging-type movement towards the gas pump using the ledge of the gas pump as leverage against the officers. Sergeant Perry said that at one point, he lost hold of the Defendant's right hand that had been cuffed. According to Sergeant Perry, the Defendant was "pushing and resisting, "fighting with everything he had," in an effort to free himself and get to his feet. Ultimately, Trooper Connors took the Defendant to the ground in order to handcuff him.

This court is required to construe the element of force broadly. Moreover, "this court has consistently held that a defendant's efforts in preventing an officer from handcuffing him are sufficient to support the element of force." State v. Sangria Venturia Baker, Jr., No. W2018-00732-CCA-R3-CD, 2019 WL 2404977, at *6 (Tenn. Crim. App. June 7, 2019) (finding sufficient evidence where the defendant "refused to place his arms behind his back so that he could be handcuffed," and he "lay on one arm and stretched the other away from his body," struggling with the officers before they were able to cuff him),

perm. app. denied (Tenn. Sept. 20, 2019); State v. Gary Mitchell Hestand, No. M2014-02208-CCA-R3-CD, 2015 WL 10684326, at *8 (Tenn. Crim. App. Oct. 7, 2015) (finding sufficient evidence where the defendant "resisted official commands to halt and to show his hands in order to be handcuffed," and when he continued to resist, both deputies had to subdue him "on the ground in order to handcuff him"); State v. Jeremy D. Parvin, No. E2014-01569-CCA-R3-CD, 2015 WL 2128585, at *3 (Tenn. Crim. App. May 6, 2015) (finding sufficient evidence where the defendant pulled away from officer, balled up his fist, then "locked his hands beneath him" when officer attempted to handcuff him); State v. Jonathan Lamont Jones, No. W2011-02311-CCA-R3-CD, 2012 WL 4057263, at *3 (Tenn. Crim. App. Sept. 17, 2012) (finding sufficient evidence where the defendant pulled his hands away from the arresting officers and "continued to resist the officers when they attempted to handcuff him"); State v. Timothy Wayne Grimes, No. M2001-02385-CCA-R3-CD, 2002 WL 1885053, at *4 (Tenn. Crim. App. Aug. 16, 2002) (finding sufficient evidence where the defendant "locked his arms, thus preventing the officers from putting handcuffs on him"); State v. Daniel M. Tidwell, No. 01C01-9807-CC-00288, 1999 WL 436840, at *3 (Tenn. Crim. App. June 30, 1999) (finding sufficient evidence where the defendant "flailed his arms and struggled with the officers" as they were attempting to handcuff him); State v. Edward Iroghuehi Isibor, No. 01C01-9610-CC-00441, 1997 WL 602945, at *3 (Tenn. Crim. App. Sept. 30, 1997) (finding sufficient evidence where the defendant "flailed his arms" in an effort to prevent being handcuffed); State v. Ronald David Lee, No. 03C01-9410-CR-0039, 1995 WL 395840, at *5 (Tenn. Crim. App. July 6, 1995) (finding sufficient evidence where the defendant wrestled with the officer attempting to handcuff him); State v. William Randy Jackson, No. 02C01-9405-CC-00097, 1995 WL 81428, at *1 (Tenn. Crim. App. Mar. 1, 1995) (finding sufficient evidence where the defendant struggled with officers to avoid being handcuffed). Under these circumstances, we conclude that the Defendant did more than just engage in a negligible use of force.

As for the Defendant's intent, we note that the Defendant, once properly identified, was on probation and did have outstanding warrants for his arrest. The Defendant stated during the encounter, that he was going to "make this hard" for the officers to identify him. The Defendant also told the officers that he was going to wait in his car until he was not allowed by Sergeant Perry to do so. In response to the Defendant's continued disdain for having to provide more identifying information, Trooper Connors told the Defendant that they could do this "the easy way or the hard way," but the Defendant continued to be uncooperative. Moreover, when Sergeant Perry was asked if anything about the Defendant's behavior prior to his arrest indicated that the encounter "might turn physical," Sergeant Perry replied that the Defendant placed his right hand in his pants when Trooper Connors first approached, though this was not captured by the recording. When Trooper Connors ordered the Defendant to take his hand out of his pants, the Defendant responded, "It's a free country. It's America. I'll put my hands in my pants if I want to," and he put both hands in his pants. Sergeant Perry further indicated that the Defendant's placing his

hair back into a ponytail so as not to lose any dreads was a signal from the Defendant that he was going to leave or fight the officers.

Though many of the cases cited above arguably had more egregious circumstances than present here—a fact observed by the Defendant in his appellate brief—we believe that the abundance of decisions citing similar facts support the trial court's determination here that the Defendant forcibly and intentionally prevented or obstructed the officers from effecting a stop, frisk, halt, or arrest. Accordingly, we hold that the evidence was sufficient to support the Defendant's conviction for resisting arrest.

As an alternative argument, the Defendant submits that he acted in self-defense when he justifiably resisted the officers' use of unlawful force. In support of this argument, the Defendant observes that "he knew the police had the wrong person, he believed he was innocent, he believed that the police were harassing him, and he believed they would hurt him." According to the Defendant, the proof indicates that he was "feeling terrified, and only tried to protect himself from the unlawful arrest after he reasonably perceived the [t]roopers, who were much larger than he [was], as using greater force than was necessary under the circumstances."

We reiterate that outside the context of self-defense, it is not a defense to resisting arrest that the arrest was unlawful. See Tenn. Code Ann. § 39-16-602(b). Moreover, unless a defendant is claiming self-defense against excessive force from officers, see Tennessee Code Annotated section 39-11-611(e), "[w]hether the arrest was or was not supported by probable cause is not determinative as to whether defendant resisted arrest." Edward Iroghuehi Isibor, 1997 WL 602945 at *3. With regard to self-defense in this case, the pertinent part of the Tennessee Code provides as follows:

> The threat or use of force against another is not justified . . . [t]o resist a halt at a roadblock, arrest, search, or stop and frisk that the person using force knows is being made by a law enforcement officer, unless:
> (A) The law enforcement officer uses or attempts to use greater force than necessary to make the arrest, search, stop and frisk, or halt; and
> (B) The person using force reasonably believes that the force is immediately necessary to protect against the law enforcement officer's use or attempted use of greater force than necessary.

Tenn. Code Ann. § 39-11-611(e)(3); see also State v. Reginald Bernard Wilson, No. E2018-01684-CCA-R3-CD, 2019 WL 7049691, at *4-5 (Tenn. Sept. 24, 2019). These statutes clearly establish that the legality of the arrest is irrelevant in determining whether a conviction for resisting arrest is proper.

The trier of fact determines whether the defendant acted in self-defense. State v. Dooley, 29 S.W.3d 542, 547 (Tenn. Crim. App. 2000) (citing State v. Goode, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997)). "[I]n the context of judicial review of the . . . verdict, in order to prevail, the defendant must show that the evidence relative to justification, such as self-defense, raises, as a matter of law, a reasonable doubt as to his conduct being criminal." State v. Clifton, 880 S.W.2d 737, 743 (Tenn. Crim. App. 1994). The State has the burden of negating the defendant's claim of self-defense in the event that "admissible evidence is introduced supporting the defense." Tenn. Code Ann. § 39-11-201(a)(3).

Here, the trial court considered the Defendant's self-defense claim and determined that the officers did not use excessive force. Specifically, the trial court concluded that nothing in the video suggested "that there was excessive force used" at the time Sergeant Perry put the cuff on the Defendant's right hand. Following our review of the video recording, we are compelled to agree with this conclusion.

The Defendant's belief, alone, is not sufficient to support his contention that self-defense was justified. As this court has previously concluded, the defense of self-defense

> not only entail[s] what a defendant actually believes, but include[s], as well, what is a reasonable belief under the circumstances. This means that the defendant's conduct and mental state must meet an objective standard of reasonableness for the conduct to be justified under th[is] statutory defense[]. <u>Thus, the mere fact that the defendant believes that his conduct is justified would not suffice to justify his conduct</u>.

State v. Bult, 989 S.W.2d 730, 732 (Tenn. Crim. App. 1998) (emphasis added).

We cannot say that the Defendant's conduct in this case meets an objective standard of reasonableness. Nothing in the video or Sergeant Perry's testimony suggests that the officers used excessive force when they began to place handcuffs on the Defendant and detain him in order to determine his identity and whether he was the possible suspect for whom they had been searching. They merely advised the Defendant that he was being detained and attempted to handcuff him, which does not amount to "greater force than necessary to make [an] arrest." See, e.g., State v. Morgan Johnson, No. W2003-02349-CCA-R3-CD, 2004 WL 2237988, at *4-5 (Tenn. Crim. App. Oct. 1, 2004) (rejecting the defendant's self-defense claim, noting that the relevant statutes clearly establish that the legality of the arrest was irrelevant); State v. Richard C. Silk, No. M1999-02526-CCA-R3-CD, 2001 WL 208509, at *6 (Tenn. Crim. App. Mar. 2, 2001) (concluding that the evidence adduced at trial supported a finding by the jury that the officers' conduct in securing the defendant in their custody prior to showing him the warrant did not constitute an unnecessary use of force). The trial court had sufficient evidence upon which to reject the Defendant's claim of self-defense.

## CONCLUSION

Upon consideration of the foregoing, we conclude that the evidence was sufficient beyond a reasonable doubt to support Defendant's conviction for resisting arrest. The judgment of the trial court is affirmed.

_____
D. KELLY THOMAS, JR., JUDGE